A. F. COWLEY et al., Appellees, v. CHARLES R. REYNOLDS et al., Appellants.

**DRAINS: Subdistricts—Right to Connect with Outlet—Lands Outside District.** Owners of land within a drainage subdistrict, for the construction of the main drain of which they have been assessed, on such lands only, may, *provided they follow the general course of natural drainage,* so drain their lands, both *within* and *without* said subdistrict, as to connect with the main drain of the subdistrict, even though by so doing an unsuspected burden is cast upon such main drain. In other words, the creation of a public drainage improvement does not destroy or abridge the landowner's right to avail himself of natural watercourses. (See Sections 1989-a23, 1989-a53, Code Supp., 1913.)

**WATERS AND WATERCOURSES: Diversion of Waters—Shortening General Course of Natural Drainage.** The requirement that, in drainage improvements, the general course of natural drainage shall be adhered to, is not violated by cutting through intervening elevations of land, and thereby so leading the improvement, wholly on one's own land, through a short cut, that the waters reach the same ultimate outlet as would otherwise be reached in a roundabout way. So held where a landowner, with lands within a drainage subdistrict, cut through elevations on such lands in order to drain lands not within such subdistrict, all the lands having the same general course of natural drainage. (See Sections 1989-a23, 1989-a53, Code Supp., 1913.)

**EQUITY: Decree—Imposition of Equitable Conditions—Drains.** Equitable conditions will not be imposed on a landowner within a drainage subdistrict as a condition precedent to his right to use the main drain of the district for the drainage of lands *outside the district*, on which, of course, he has not been assessed, when it appears (a) that said main drain is sufficient to carry said added drainage; (b) that the complaining parties will not be injured, and will, in a degree, be benefited; (c) that shortcoming in the main drain will not be caused by said added drainage; (d) that the landowner so seeking to use the drain was not

blameable for the insufficiency in size of the subdistrict; and (e) that such landowner was furnished nothing by the subdistrict except the *opportunity* to build to an outlet, but was assessed at $14 per acre—the highest in percentage within the district.

*Appeal from Wright District Court.*—J. L. KAMRAR, Judge.

WEDNESDAY, DECEMBER 13, 1916.

SUIT in equity, to enjoin the alleged diversion of water from its natural watercourse. There was a decree for the plaintiffs, and the defendants appeal.—*Reversed.*

*B. H. Mallory* and *Birdsall & Birdsall,* for appellants.

*Peterson, McGrath & Archerd,* for appellees.

1. DRAINS: subdistricts: right to connect with outlet: lands outside district.    EVANS, C. J.—Reference to the following plat will be an aid to an understanding of the evidence.

The said plat was prepared by an engineer, at the instance of the defendants, and was offered in evidence by the defendants. In some specific respects, its correctness is disputed by the plaintiffs, and the questions thus raised will be considered in the opinion. Otherwise, the general correctness of the measurements and elevations shown on the plat is well supported by the evidence, and is not challenged. The plaintiffs, Leach, Cowley and Smith, are the principal landowners in a certain drainage subdistrict, No. 73, which subdistrict is a part of the original district, No. 7. The defendants are the joint owners of the northeast quarter of Section 2, which land is located at the head of Subdistrict No. 73. Subdistrict No. 73 was laid out so as to include 30 acres of the defendants' land in their southwest 40, and 5 acres thereof in their southeast 40, the rest of the land of the defendants being omitted from the subdistrict. The defendants claim that all their land within the boundaries indicated upon the plat has its natural course of drainage towards

PLAT OF DRAINAGE DISTRICT SUB. Nº 73, WRIGHT COUNTY IOWA.

the south, and is within the same general watershed as Subdistrict No. 73. The plaintiffs claim that there is a natural divide which separates the 35 acres included within the subdistrict from the land of the defendants lying farther north. The defendants were proceeding to tile-drain their land, in such a way as to carry the water into the main drain of Subdistrict No. 73, and were restrained therefrom by the institution of this suit. Such is the general nature of the controversy. Original District No. 7 includes all the lands of all the parties hereto. Its main drain is an open ditch, and has its head, as shown on the map, in the northwest quarter of the northwest quarter of Section 2, and it carries the water to the south to the center of Section 11, and thence to the east. The main drain of Subdistrict No. 73 is a covered tile drain. It has its outlet, as indicated on the map, a short distance east of the center of Section 11. Its head is at the point 108.02, on the south line of the defendants' land. The principal beneficiaries of the subdistrict, and the principal contributors to its cost, were the plaintiffs, Leach, Smith and Cowley, and the defendants. The approximate cost of the improvement was $3,200, of which $451 was assessed against the defendants, for the outlet afforded at their south line. The boundaries of the subdistrict were fixed on the theory that there was a natural divide cutting off 35 acres of the defendants' land from that farther north, and that the land lying to the north was within a different watershed. The contention for the defendants is that all their land indicated in the plat is, in a practical sense, within the same watershed, and that practical drainage of all such land is impossible, except towards the south and through the 35 acres of their land which has been included in the subdistrict. The dilemma presented is, on the one hand, that, if the course of natural drainage for the defendants' land is toward the south, they are entitled to avail themselves of it, regardless of the burden thus cast upon the subdistrict to the south; and, on the other hand, if the defendants are

entitled to thus cast their water into the drains of the sub-district, they will be receiving benefits for which they were not assessed, in that they were assessed for benefits to 35 acres only.

Our first impressions of the case were favorable to the contention of the plaintiffs. A careful consideration of the record, however, has satisfied us that it cannot be sustained. We shall set forth the reasons for our conclusion as briefly as practicable.

Near the northwest corner of the southwest 40 of defendants' land is a pond, noted on the plat as 109.01. This is a strategic point in the controversy. It is the contention for the plaintiffs that this pond lies wholly outside of the sub-district; whereas the defendants contend that it is wholly within it. The plaintiffs introduced evidence tending to show that the intention was to run the north line of the subdistrict about 200 feet south of such pond. The engineers on both sides, however, concede that, following the courses and distances as made of record in the establishment of the district, the north line of the district runs either through the center of the pond or wholly north of it. It must be taken as a fact, therefore, that the district, as laid, includes at least the south half of this pond. There is further dispute at this point. For the plaintiffs it is contended that the overflow from this pond runs west, and flows naturally towards the open ditch of the original District 7; whereas the defendants contend that this pond has two outlets, one flowing south-easterly, toward point 108.02 (being the head of the tile drain of Subdistrict 73), and the other flowing southwesterly along the line ABCD, entering the tile drain of Subdistrict 73 near the south line of the Leach land. The engineers on both sides measured the elevations of these two outlets. The engineer for the plaintiffs found the elevation of the outlet to the southeast to be 7 inches higher than that to the southwest; whereas, the engineers for the defendants found such differ-

ence in elevation to be only 1 or 2 inches. We think the difference between the engineers' measurements at this point is not very material. Accepting either one, it is plain that, when considerable water is running, it will discharge its overflow over both courses. The mere location of the main drain in Subdistrict 73 indicates a watercourse between the points 108.02 and 109.01. Unless there is a watercourse along such line, it would be difficult to account for the classification of the defendants' land for the purpose of assessment, which will be referred to later. The line ABCD represents the course of the water which takes the southwesterly outlet, as claimed by the engineers for the defendants. For the plaintiffs it is claimed that such is not its course, but that its true course is north and west, into the main ditch. This contention is not sustained by the testimony. The circumstance put forward by the plaintiffs in support of the contention is that the Sellick land is actually drained into such open ditch of the original District 7. But it is shown conclusively, by the testimony of the owners of the land, that such drainage was accomplished by cutting through a divide to a maximum depth of 12 feet, in order to carry the water into such open ditch. We think that no other conclusion of fact can fairly be reached than that the water from both outlets in pond 109.01 reaches, in natural course, the main drain of Subdistrict 73, the one at point 108.02, and the other at point D. It is also true, as already indicated, that the north boundary of the subdistrict, as laid, includes both outlets of such pond within the subdistrict. It follows necessarily that the defendants are entitled to avail themselves of the outlet for which they paid, to the boundary of the district as actually laid. The practical effect of the exercise of such right would be to discharge pond 109.01 into the main tile of the subdistrict, at point 108.02.

Turning our attention now to the other wet lands of the defendants, lying north of the subdistrict, certain ponds are indicated thereon, together with the elevations of their deep-

est points. The testimony shows that these ponds are deeper than pond 109.01, but these measurements do not indicate the elevation of the surface of the ground, or the surface of the pond when full. The testimony also shows that the surface of the ground on this area is very flat, with a slight incline to the south, and toward pond 109.01. Likewise, the surfaces of the various ponds are nearly on a level with each other and with pond 109.01. It is not seriously disputed that the natural course of drainage of this area, such as it is, is toward 109.01. It is because of this fact that the question of the location and outlets of this pond has been deemed so important in the case. If this be the natural course of drainage for such area, then the defendants were within their rights in draining their land in this direction. It was none the less their right because it operated to cast an unsuspected burden upon Subdistrict 73. We hold, therefore, that the exercise by the defendants of the right to drain pond 109.01 into the subdistrict main, in no manner abridged their right to avail themselves of their natural watercourses leading into this pond from their other land.

The next strategic point in the case is pond 107.41. This is the deepest pond upon the area. The defendants proposed to take a short cut in the discharge of the waters of this pond. From the line of tile between 109.01 and 108.02, they proceeded to construct a line to the northeast, as indicated on the plat, intending to connect with pond 107.41. In order to accomplish this, they had to cut across high ground having an elevation of from 1 to 2 feet. This elevation constitutes the divide for which the plaintiffs contend as fixing the boundaries of the subdistrict. This divide extends from southeast toward the northwest, in the direction of pond 109.01, becoming lower in elevation as it approaches such pond, and quite disappearing before it reaches the same. The plaintiffs contend that it was a clear case of diversion of water from its natural course, to take

2. WATERS AND WATERCOURSES: diversion of waters: shortening general course of natural drainage.

the water of pond 107.41 through this divide. The answer of the defendants is that, inasmuch as they were entitled to take this water into pond 109.01 and thence down, they were entitled to accomplish the same result by the more practical and economic method of a shorter course.

It is made to appear, by the actual measurement of the engineers upon the ground, that the boundaries of the subdistrict, as laid at this point, lie 300 feet northerly of the divide in question. We have, therefore, a situation somewhat similar to that obtaining at pond 109.01. In this 40-acre tract, 30 acres of defendants' lands were included within the district. They were assessed upon that basis. Surely it does not lie with a district or its beneficiaries to challenge the right of the defendants to extend their tile to the boundaries of the district as laid. The exercise of this right at this point would carry the defendants' drain beyond the divide, and into the low ground contiguous to the pond in question. In view of the fact that the extension of the tile into the pond beyond the boundary could have no other effect than to carry, by a short and practical course, the same water into the same drain into which it would ultimately come, even if brought by the more roundabout course, we see nothing in such situation to call for interference by a court of equity. The plan proposed is consistent with the substantial rights of the parties, and is clearly in accord with the requirements of practical drainage. We have aimed at all times to construe the drainage law and drainage rights consistently with practical and economic methods of drainage. Practical drainage does not take great account of inches at the surface. The grade line is to be found along the bottom of the ditch, and not at the surface of the ground. Slight elevations of the surface should not be permitted to balk or deflect a scheme which is demanded by practical and economic considerations, if the scheme as a whole adapts itself to the general course of drainage. Such is the legislative edict, and such is the

trend of all our later cases. In *County Drains v. Long,* 151 Iowa 47, 52, we said:

"Every extensive drainage district necessarily has within it varying elevations. It may include ponds and minor watercourses, and these may be separated from each other by the irregularities of a comparatively flat surface. The statute should be construed in a practical way and with due regard to the practical engineering problem involved in the given drainage project. If every increased elevation of a foot or two could bar the progress of a drain toward its ultimate outlet, then few drainage projects would be practicable. A drainage ditch usually is of varying depth, and this variation is necessarily caused by the differing elevation at the surface. We do not think that the difference in the elevation in this case should be deemed sufficient to show a diversion of water from its natural course within the meaning of the statute. We think, also, that the course adopted by the engineer was permissible by the express terms of the statute. The provision relied upon by appellant is that portion of Section 1989-a2 which reads as follows: 'That the ditches or drains herein provided for shall be surveyed and located along the general course of the natural watercourses, or in the general course of natural drainage of the lands of said district, having due regard for straightening and shortening of such natural streams, watercourses, and course of natural drainage.' It will be noted that this provision permits a drain to be laid 'in the general course of natural drainage of the lands of said district,' and it permits the 'shortening of such natural . . . course of natural drainage.' The most that can be said of drain 44 is that it tended to shorten the natural course."

The case of *Dorr v. Simmerson,* 127 Iowa 551, is instructive at this point. That case involved the drainage of a pond which was situated upon a divide, and discharged its overflow through two outlets, in opposite directions and into different watersheds, one outlet being slightly lower in elevation than

the other, and therefore taking the first flood. We held that the owner of the land was entitled to avail himself of either watercourse or both. He took the water through the outlet of higher elevation, and his right to do so was sustained. We held also, in the same case, that the owner was entitled to shorten the natural watercourse by cutting across a sharp bend or oxbow therein, and thereby to discharge the water at a lower point in the natural course, without sending it around the full circuit thereof. In view, therefore, of the fact that the boundaries of the district, as laid, extended beyond the divide and into the watershed of pond 107.41, even according to plaintiff's own theory, and in view of the fact that the extension complained of did not cut through any divide at the boundaries of the district or outside thereof, we think the defendants were within their rights in conducting the water upon their own land in their own way, inasmuch as they brought it into its own course while yet upon their own land.

On the question of actual injury which the plaintiff landowners will sustain by reason of the proposed action of the defendants, some stress is laid. The evidence on that question is confined wholly to a great flood that swept over Subdistrict 73 in June, 1914. At that time, an unprecedented rain of 7 inches fell within a brief space, and covered the entire area with a flood. The claim put forward for the plaintiffs is that the defendants' tile drain, which was at that time in course of construction, caused the flooding of plaintiffs' lands. We are satisfied that there is no reasonable basis for such a claim. That flood was extraordinary, and the testimony of engineers is undisputed that it is not practicable to put in tile drains which will take care of great floods. A flood must be permitted to run off over the surface of the ground. In the flood in question, the tile drains were simply covered with water from outlet to head. No other occasion is referred to in the testimony wherein it is claimed that the drainage

3. EQUITY: decree: imposition of equitable conditions: drains.

of the plaintiffs' lands was interfered with by the discharge of defendants' water. We are satisfied from the testimony of the engineers, which is not greatly in dispute, that the drain of Subdistrict 73 is quite sufficient to carry off all the water on the defendants' land, as well as that upon the plaintiffs'. This drain consists of a 15-inch tile at its outlet, and of a 10-inch tile at the south line of the defendants' lands. Its grade is much steeper than is possible for the defendants to adopt in the draining of their lands. In the diversion, if any, of water from the southwesterly outlet of pond 109.01, the plaintiff Leach is benefited rather than injured, in that such water is prevented from passing over his land. The plaintiff Smith is not affected one way or the other. If the water followed both courses or either course, it would all be in the main drain before it reached the Smith land.

The greatest menace apparent in the record to the future efficiency of the main drain of this subdistrict, is the possible insufficiency of its outlet at the open ditch of the original District No. 7. The levels of the engineer show that, when the main ditch is full of water, the tile drain will also be full, for the greater part of its length. This condition, of course, can only be remedied by increasing the efficiency of the open ditch. This menacing condition will not be increased by the taking of defendants' water through the tile drain. If all the water from defendants' land were conducted to the head of the open ditch, in accordance with the contention of the plaintiffs, it would contribute just as much to the filling of the open ditch as if it reached it by any other course.

Whether the conclusion reached by us brings us to an equitable result, is a question to which we have given much consideration. It is argued, with much force, that the effect of such conclusion will be to confer benefits upon 30 or more acres of lands of the defendants for which they have paid no assessment. The proposition, upon the face of it, appeals to our sense of equity, and we have considered much whether it is within our power to impose equitable conditions

upon the defendant; and, if within our power, whether equitably any conditions ought to be imposed. We are impressed, from the record as a whole, that the formation of the subdistrict was abortive, so far as the fixing of the north boundary was concerned; and this is so even though it had been fixed at the so-called subdivide, as was perhaps intended. Unless the upper land of the defendants, which is shown upon the plat, is a part of the watershed of Subdistrict 73, then it belongs in no watershed, except as it may be deemed as being within a watershed of its own. If the latter, it has no outlet; for, as we have seen, both outlets of pond 109.01 carry the water into this subdistrict.

It is urged for the plaintiffs that the defendants ought to have objected to the formation of the district, and ought to have insisted upon a larger inclusion. As against that, it should be said for the defendants that they had nothing affirmatively to do with the organization of the subdistrict. They were nonresidents, and knew of the proposed organization of the subdistrict only in a general way. There were no monuments upon the ground to indicate anything. It is true they could have ascertained from the public records just what was proposed. We think, however, their duty was no greater in the premises than was that, of the other landowners. It appears from the assessment of benefits that the defendants were charged with about one seventh of the total cost of this enterprise; and this was charged against them for a mere outlet, without the construction of one foot of improvement on their land. The 30 acres included within the district out of the southwest 40 of defendants' land, was the only land in the district that was classified for the purpose of assessment at 100 per cent, and it was assessed at the rate of $14 per acre. Though the entire improvement was constructed upon the lands of the three plaintiffs, not one of them was assessed approximately as high per acre as was the land of the defendants, to which only an outlet was awarded. This circumstance is, to our mind, strongly corroborative of the

claim that there must have been a watercourse between points 109.01 and 108.02, as we have already indicated.

A consideration of the assessment of benefits made against the defendants for their mere outlet, as compared with the assessment of benefits made against the other principal contributors both for outlets and a constructed improvement, leads us to believe that the conclusion we reach is not inequitable in result. We have no occasion, therefore, to devise equitable conditions to impose upon the defendants. We are quite satisfied from the record that the threatened injury to the plaintiffs will never materialize, and that the amount of assessment made against the defendants for the benefit of outlet was sufficient to entitle them equitably to the utilization of such outlet in the manner proposed.

The conclusion thus reached renders it unnecessary that we should consider other questions pressed upon our attention by the appellants. For the reasons indicated, the decree below must be—*Reversed.*

DEEMER, WEAVER and PRESTON, JJ., concur.